**UNITED STATES of America, Plaintiff,**

v.

**Marilyn ROBERTS, Defendant.**

Criminal Action No. 95–00161–09–CR–W–3.

United States District Court,
W.D. Missouri,
Western Division.

June 17, 1996.

Patrick McInerney, United States Attorney's Office, Kansas City, MO, for plaintiff.

Phillip Greenfield, Rouse, Hendricks, German, May & Shank, Kansas City, MO, for defendant.

### ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

SMITH, District Judge.

On May 10, 1996, the Honorable Robert E. Larsen, United States Magistrate Judge, issued his Report and Recommendation (the "Report") that determined, *inter,* that (1) a photo spread shown to Mark Lograsso was impermissibly suggestive, (2) Lograsso's identification of Defendant lacked independent reliability, (3) Defendant's arrest was pretextual, (4) Defendant's arrest was not supported by probable cause, (5) Defendant's arrest violated Rule 5(a) of the Federal Rules of Criminal Procedure, and (6) all information obtained during Defendant's detention was the result of coercion. Plaintiff has filed objections to the Report; the Court has reviewed the Report, the motions and responses that preceded the Report, the transcripts of the hearings held by Judge Larsen, and the Plaintiff's objections to the Report. The Court concludes that Judge Larsen's careful and thorough analysis of the law and his application of the law to the facts of this case are correct, and the Report is therefore adopted as the opinion of this Court. The Court reinforces Judge Larsen's legal conclusions with the following observations and comments.

*Photo Spread*

Based upon the record, there appears little doubt that the photo spread was impermissibly suggestive. The fact that Defendant was the only participant in the array that wore a paper suit and spit mask demonstrates this point. Beyond this, the varying ages and hair colors of the photos' subjects presents additional concerns, particularly in light of the nature of the crime in question and Agent Gasvoda's testimony that to avoid suggestiveness, one does not want a brunette suspect to be included in an array with only blonde participants. Tr. 295–96. Furthermore, as Judge Larsen aptly stated, suggestiveness of an array "does not depend upon the inventory of pictures the police department happens to have available as filler photos."

With respect to the identification's independent reliability, *see Neil v. Biggers,* 409 U.S. 188, 199–200, 193 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *United States v. Rundell,* 858 F.2d 425, 426–27 (8th Cir.1988), the Court is persuaded that Judge Larsen's assessment of the identification's independent reliability is correct. In addition, the Court notes that Lograsso himself stated that he might not have been able to identify the Defendant if all of the women in the photo spread were blondes. Given the witness' admission that a non-suggestive array might not have resulted in identification of the Defendant, the Court cannot conclude that the witness' identification has independent reliability.

*Probable Cause*

■ There is no need to add anything to Judge Larsen's discussion of this issue. However, the Court feels compelled to respond to this discussion contained in footnote two of Plaintiff's Objections. The Court concludes that Plaintiff's intimation that it was somehow surprised by the topic of probable cause is not well-taken. The issue was raised at the November 9, 1995 hearing on co-defendant Maude Clarke's suppression motion. More importantly, prior to this Defendant's hearing, counsel for Defendant twice declared his intention to raise issues relating to the constitutionality of Defendant's arrest. Tr. at 3–4, 8. Judge Larsen indicated that he would keep the record open if additional evidence or testimony were needed. Tr. at 8–9. At the conclusion of the hearing, Judge Larsen adhered to his statement at the beginning of the proceeding and kept the record open. Tr. at 331. It does not appear the Plaintiff was blindsided by this issue.

*Pretextual Arrest—The 20–Hour Hold*

Subsequent to Judge Larsen's Report and Recommendation, the Supreme Court decided *Whren v. United States,* —— U.S. ——, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), which held that the test for reasonableness of a search or seizure under the Fourth Amend-

ment is objective and not subjective. The Court does not believe *Whren* to be applicable to this case because in *Whren* the defendants were arrested and charged after an allegedly pretextual search; here, the Defendant's arrest was nothing more than an investigative tool designed to coerce Defendant's cooperation in Plaintiff's effort to gather evidence. Moreover, the Court notes that Judge Larsen correctly forecasted and utilized an objective standard. Report and Recommendation at 44–45 ("the Court, if presented with the question, would adopt what has been termed the 'absolute objective approach.' ").

■ The Court also notes that the Plaintiff has directed the Court to an article written by Professor John Scurlock to demonstrate that "the concept of 'arrest for investigation' in Missouri has been recognized for many years and the 20–hour rule likewise recognized as part of the practice." Plaintiff's Objections at 12 n. 8 (citing Scurlock, *The Law of Arrest in Missouri*, 29 UMKC L.Rev. 117, 127–29 (1961)). To clarify, Professor Scurlock actually stated that " '[a]rrest for investigation' seems to have become an accepted institution, the legality of which would be beyond doubt if frequency of occurrence were the same as legitimation. But use does not make authority." Scurlock at 127. Professor Scurlock continued by opining that "[a]n intention that the arrestee shall not be held on a criminal charge or brought before a judge would be manifestly in derogation of the arrestee's constitutional rights." *Id.* at 128. Thus, though there is no "iron-clad rule that the arresting officer must forthwith charge the arrestee with the commission of a determinate crime," the 20–hour hold was not intended to be an investigatory tool; "the evident design of the Twenty Hour Rule ... is to assure that no one shall be held in extended custody except upon process issued by a judge entailing the presentation of the arrestee before him...." *Id.* at 128–29. Although officers have obvi-

ously interpreted the rule as permitting "the apprehension of an individual for purposes of investigation, with the maximum period for which detention can endure for this purpose set at twenty hours," this is not what the rule is for. Here, there was never any interest in presenting Defendant to a judge; the sole purpose of the pick-up was to hold Defendant until she either cooperated or twenty hours expired. This is not permissible.

*Rule 5(a)*

■ The Court concurs in Judge Larsen's conclusion that the law enforcement officers were required to, but did not, comply with Rule 5(a).[1] In addition to the authorities relied upon by Judge Larsen, the Court adds the following statement of law as set forth by the Eighth Circuit:

> The requirements of [Rule 5(a)] and the teachings of the Supreme Court in *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) are designed to frustrate law-enforcing officers from detaining the arrested person for an unnecessary period of time to enable the officer to extract a confession from the arrested individual. But this salutary principle is not applicable where the person under arrest is in the custody and under the control of local and not federal officers, *unless, of course, the state officers are acting at the direction of or in concert with the federal officers, or there is collaboration between the federal and state authorities.*

*United States v. Morris*, 445 F.2d 1233, 1236 (8th Cir.), *cert. denied*, 404 U.S. 957, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971) (citing cases) (emphasis added).

Accordingly, the Court grants Defendant's motion to suppress Lograsso's identification and all evidence obtained during her detention.

IT IS SO ORDERED.

1. Rule 5(a) provides, in pertinent part, as follows:

 Except as otherwise provided in this rule, an officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant must take the arrested person without unnecessary delay before the nearest available federal magistrate judge or, if a federal magistrate judge is not reasonably available, before a state or local judicial officer authorized by 18 U.S.C. § 3041.

### REPORT AND RECOMMENDATION TO GRANT DEFENDANT'S MOTION TO SUPPRESS PHOTO IDENTIFICATION TESTIMONY AND ALL FRUITS OF THE UNLAWFUL ARREST

LARSEN, United States Magistrate Judge.

Before the court are defendant's motion and supplemental motion to suppress photo identification testimony on the grounds that (1) the photo spread was impermissibly suggestive, (2) the identifications lacked independent reliability, (3) defendant's arrest pursuant to a Missouri pick-up order was unconstitutional as it was a pretextual arrest and was not supported by probable cause and all of the fruits thereof are inadmissible, and (4) all evidence obtained during defendant's investigatory detention was coerced either by use of the Grand Jury subpoena or the length of the detention. I conclude that the photo array was impermissibly suggestive, Lograsso's identification was not independently reliable, defendant's arrest was not supported by probable cause, defendant's arrest pursuant to the Missouri 20–hour hold law was an unlawful pretext for investigative purposes, the government intentionally circumvented procedures in place to protect defendant's constitutional rights, Rule 5(a) applies to this case because of the working arrangement between the state police and federal agents, the requirements of Rule 5(a) were not met since defendant was never taken before a judge after her arrest, and defendant's consent to be photographed was the product of coercion. Therefore, defendant's motion to suppress evidence resulting from her unlawful arrest and detention and the fruits [1] of that unlawful detention should be granted.

### I. BACKGROUND

On December 6, 1995, an indictment was returned charging defendant with one count of conspiracy to violate the Travel Act, in violation of 18 U.S.C. § 371, and one count of crossing state lines with intent to carry on a business enterprise involving a prostitution offense, in violation of 18 U.S.C. § 1952(a)(3).

On February 1, 1996, defendant filed a motion to suppress photo identification testimony on the grounds listed above (document number 135). On February 9, 1996, the government filed its motion in opposition (document number 142) stating that "[a]ny singularity of the defendant as depicted in the photospread was not the fault of the law enforcement officers, but was the product of the defendant's uncooperative and abusive manner and belligerent attitude toward her custodians." On March 4, 1996, the defendant filed supplemental suggestions in support of her motion (document number 163) arguing that Section 544.170, the statute relied upon by the Missouri police in arresting suspects pursuant to a 20–hour hold, "does not *independently authorize* arrest, let alone an arrest made for the purpose of gathering evidence for a federal investigation"; defendant's arrest was pretextual; and defendant's arrest was not supported by probable cause.

On March 4, 1996, the government filed its supplemental response (document number 164) arguing that photographs and fingerprints are not testimonial in nature and have no fourth amendment protections. Finally, on March 8, 1996, the government filed a second supplemental response (document number 165).

On February 26, 1996, an evidentiary hearing was held before me. The defendant was present represented by Phillip Greenfield. The government was represented by Assistant United States Attorney Pat McInerney. Seven witnesses testified and nine exhibits were admitted. Those witnesses and exhibits were:

1. Detective John Rooney, Kansas City, Missouri Police Department;

2. Officer Rita Olson–Stawicki, Kansas City, Missouri Police Department;

---

1. On this record, I am unable to determine exactly what the "fruits" of the unlawful arrest are. Clearly, the identification made by Mr. Lograsso and any subsequent identification are fruits since the identification was not independently reliable. Whether the photo array or picture were shown to anyone else is not discernable from this record.

3. Linda Hutson, Kansas City, Missouri Police Department Detention Unit;

4. Detective Doug Panuco, Kansas City, Missouri Police Department;

5. Detective Karl Oakman, Kansas City, Missouri Police Department;

6. Mark Lograsso, a client of MCC Remodeling who paid money for sexual acts by prostitutes;

7. Steve Gasvoda, Special Agent with the United States Secret Service.

P.Ex. 1 Photo lineup of defendant Marilyn Roberts;

P.Ex. 1A One of three photographs taken of defendant Marilyn Roberts by Detective Rooney on June 30, 1995;

P.Ex. 2 Photograph from a passport;

P.Ex. 3 Credit card receipt of Mark P. Lograsso from MCC Remodeling with "Elizabeth" handwritten on it;

P.Ex. 4 Photocopy of photo lineup with defendant's picture circled and initialled by Mark Lograsso;

P.Ex. 5 Property slip from the booking procedure;

D.Ex. 4 Report of Agent Gasvoda dated February 8, 1996;

D.Ex. 8 Report by Detective Rooney written on the day of the search; and

Court's Ex. 1 Kansas City, Missouri Police Department's pick-up order on defendant Marilyn Roberts.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the suppression hearing, I submit the following findings of fact:

1. In approximately November 1994 a joint federal-state investigation involving an escort service known as MCC Remodeling began (2Tr. at 12, 140).[2] The investigation involved officers and agents from the United States Secret Service; the Internal Revenue Service; the Bureau of Alcohol, Tobacco and Firearms; the Kansas City, Missouri Police Department; the Johnson County, Kansas Sheriff's Office; and the Mission, Kansas Police Department (2Tr. at 12, 274). The agents and officers had numerous meetings with Assistant United States Attorney Pat McInerney during the investigation (2Tr. at 73). State prosecutors had no involvement whatsoever in this investigation (2Tr. at 73, 74, 79). Rather, the investigation was run solely by the Organized Crime Strike Force Unit of the United States Attorney's Office (2Tr. at 73, 318, 321).

2. From February 1, 1995, until the end of June 1995, pen registers and trap and trace devices in the office of the United States Secret Service monitored telephone lines at the residence of codefendant Maude Clarke and at four escort services listed in the phone book (1Tr. at 54–55, 75, 105–106; 2Tr. at 76).[3] The police learned through the telephone company that all of those numbers were either call forwarded or remote call forwarded to Clarke's residence and were in the names of MCC Remodeling Company or in Clarke's name (1Tr. at 106).

3. Agents learned from the telephone devices that calls would come into Clarke's residence, often from hotels and motels; and then shortly thereafter, a call would go out of Clarke's residence to a pager, a mobile phone or a residence of one of the women working for Clarke (1Tr. at 107–108, 113). The person phoned would then immediately call Clarke's residence (1Tr. at 108, 113). Approximately one hour later, another call would come into Clarke's residence from the

2. "2Tr." refers to the transcript of the evidentiary hearing held on February 26, 1996.

3. "1Tr." refers to the transcript of the evidentiary hearing held on November 9, 1995, pursuant to codefendant Maude Clarke's motion to suppress evidence. As the issues in each motion were the same (i.e., the legality of arrests pursuant to Missouri's 20–hour hold law solely for investigative purposes), the same Assistant United States Attorney appeared on behalf of the government, and there is very little, if any, factu-

al dispute on this issue, I have occasionally referred to testimony of the Clarke hearing for the purpose of presenting a clear understanding of what actually occurred. In addition, the background information on the investigation was not presented in as much detail the second time; therefore, references to the Clarke hearing are made to recount the investigation for a clear understanding of the chronology of events. Those background facts do not bear on the outcome of the issues in this motion.

original number, i.e., the hotel or motel (1Tr. at 108, 114). While that party was still on the line, the private line would go off hook, and someone at that number would make a phone call to Visa or Mastercard to verify a credit card (1Tr. at 108, 114). Finally, either 20, 30 or 60 minutes later, someone at Clarke's residence would again call the original number (1Tr. at 108, 114). This along with surveillance indicated to the police that the final call was a notification that "time was up" (1Tr. at 108). From the first part of March through the middle of June, approximately 40,000 calls were made or received at Clarke's residence (1Tr. at 109).

4. The Kansas City, Missouri Police Department conducted trash pick-ups at Clarke's residence, conducted mobile and stationary surveillance of Clarke, and interviewed some of the suspected clients (1Tr. at 104).

5. Through the trash pick-ups, police recovered documents containing women's names, amounts of money, and "tips" (1Tr. at 105). The documents also contained names from hotels, directions to a house or motel, deposit slips, and a telephone credit card listed to Maude Clarke d/b/a Affairs D'Amour (1Tr. at 105).

6. Physical surveillance of Clarke's residence was conducted from a nearby apartment rented by the police (1Tr. at 110; 2Tr. at 37). Women were seen carrying documents into Clarke's residence, remaining inside only briefly, then returning to their cars and leaving without the documents (1Tr. at 110). Clarke was observed meeting women in various parts of the city. During these meetings, the women would get into Clarke's car with documents, then get back out of the car without the documents (1Tr. at 111). On one occasion, approximately February 22, 1995, a woman believed to be defendant was observed leaving Clarke's residence late at night and driving to a coffee shop then to a residence at 6611 Barry Road in Kansas (2Tr. at 36, 37, 39). Detective Rooney was not the officer who observed the woman exit the house but he saw her enter and exit the coffee shop (2Tr. at 37, 39). He was, however, unable to identify her (2Tr. at 40). There was no testimony that the woman believed to be defendant was observed delivering documents to Clarke on this day.

7. The police used the license plate numbers of the women dealing with Clarke along with the information obtained from the pen registers to identify women working for Clarke (1Tr. at 111). When possible, those women were surveilled leaving their homes and arriving at and leaving the motels and hotels (1Tr. at 112). The agent monitoring the pen registers alerted other officers which woman would probably be meeting a client at which hotel, and the other officers attempted to reach the woman's house before she left in order to follow her to the hotel or motel (1Tr. at 112, 114). Then, if possible, an undercover officer would follow the woman into the hotel, ride the elevator with her, and follow her to her room in order to learn her room number (1Tr. at 112–113). At times, a detective or special agent would conduct a "knock and talk" with the client after the woman had left (1Tr. at 115). The officer would knock on the door, identify himself or herself as a law enforcement officer, and ask to speak to the man about what had just occurred (1Tr. at 115). The officers were often told by the clients that they had paid with a credit card for sex (1Tr. at 115). The credit card receipts provided by the clients showed prices ranging from $185 to $1,700 and listed the merchant as MCC Company (1Tr. at 116). The police were able to follow all of these events approximately four to six times (1Tr. at 118–119).

8. Federal grand jury subpoenas were used to obtain copies of checks written on the account of MCC Remodeling (1Tr. at 117; 2Tr. at 73–74, 318). Checks written to the women suspected of working as prostitutes were recovered (1Tr. at 117).

9. On one occasion late at night, defendant's car was observed arriving at the Holiday Inn on Northeast Parvin Road (2Tr. at 31, 40). A woman believed to be defendant exited the car and walked into the hotel followed by an undercover officer who observed the room defendant entered and timed her visit (2Tr. at 31). Approximately 45 minutes to one hour later, defendant was observed leaving the room, entering her car, and driving to a residence in Kansas (2Tr. at

31). After defendant's departure from the hotel room, Detective Rooney and Agent Gasvoda went to the room, identified themselves, and obtained a written statement from the "gentleman" who had just participated in the encounter indicating that he had just paid money for sex (2Tr. at 32, 62). Detective Rooney does not remember if the man was asked to give a description of the prostitute (2Tr. at 42). This incident was the only one involving defendant that Detective Rooney personally knew of (2Tr. at 32). Although defendant's height, appearance and hair coloring were similar to that of the woman he observed on February 22 at the coffee shop, he was unable to determine whether it was the same woman (2Tr. at 41). No other officer or agent was able to identify the woman as Marilyn Roberts (2Tr. at 43).

10. Sometime prior to June 22, 1995, Special Agent Steven Gasvoda of the United States Secret Service, as case agent for this investigation, prepared an affidavit for the purpose of obtaining a warrant to search Clarke's residence (1Tr. at 76, 91). The warrant was obtained on June 21, 1995, from Chief United States Magistrate Judge John Maughmer (2Tr. at 48–49, 74, 319). In addition, a federal temporary restraining order was issued on June 21, 1995, to seize Clarke's real estate and personal property including bank accounts (1Tr. at 92; 2Tr. at 319). The temporary stay was issued by U.S. District Judge Joseph E. Stevens, Jr., and the 90–day stay was issued by Chief U.S. District Judge D. Brook Bartlett (1Tr. at 92; 2Tr. at 319).

11. Detective Rooney asked Agent Gasvoda about issuing pick-up orders on the suspects in this case (1Tr. at 98). Agent Gasvoda consulted with AUSA Pat McInerney to find out whether it would be legal and told Detective Rooney that he believed issuing pick-up orders was a good idea tactically and investigatively (1Tr. at 98; 2Tr. at 328, 329). AUSA McInerney stated that he did not believe there was a problem with issuing the pick-up orders (2Tr. at 328, 330).

12. The purpose of a pick-up is to "bring [the] individual into custody, get them fingerprinted, photographed, see if they want to talk and tell their side of the story before [the police] present the case" (2Tr. at 14).

In determining whether to issue a pick-up order, a detective determines whether he or she "has enough information that if we wanted to charge them, we could at that time" (2Tr. at 76). A pick-up gives police "the authority to arrest [people] and bring them down and book them where they would be held for 20 hours" (2Tr. at 15). The federal agents here knew that they are not permitted to arrest people pursuant to a state pick-up order, and suspects cannot be arrested on a pick-up order outside of Missouri (2Tr. at 165–166). According to Detective Hernandez, a pick-up is entered in the police computer once an officer believes he or she has enough information and evidence to allow the police to "pick up an individual, hold them for 20 hours' investigation." (1Tr. at 37). According to Detective Rooney, a pick-up "allows [an] individual to be placed under arrest and taken to Headquarters and be booked for 20 hours." (1Tr. at 38). When an individual is arrested on a "20–hour hold," a detective interviews the arrestee; and then sometime during the 20 hours, the detective "can either present the case to filing of charges on an individual, or they can release an individual pending further investigation." (1Tr. at 39; 2Tr. at 137–138). With approval of a supervisor, a detective may authorize an individual's arrest merely by entering a pick-up into the computer (1Tr. at 67; 2Tr. at 14). The pick-up order does not reflect the probable cause on which it is based (2Tr. at 33). Federal agents here understood that they have no authority to arrest people for an investigative purpose (2Tr. at 325, 326).

13. Approximately one week before the execution of the search warrant, a meeting was held involving AUSA Pat McInerney, various federal agents, Sergeant Hargarden and Detective Rooney (2Tr. at 77, 319). During that meeting, it was decided which individuals would be the subject of "pick-up orders" (1Tr. at 72, 77).

14. It was decided that federal grand jury subpoenas would be obtained for all of the suspects residing in Kansas in the event they were found in Kansas and refused to voluntarily provide fingerprints and photographs, since Missouri pick-up orders were no good in Kansas and Kansas has no compa-

rable "20–hour hold" law (1Tr. at 65; 2Tr. at 165, 191, 194, 195, 290–291, 320). However, if the Kansas resident was found in Missouri, the officers made the investigative arrests rather than serve the subpoenas (2Tr. at 190–191, 193–194, 291, 293). The police officers were instructed by the United States Secret Service to attempt to get fingerprints, photographs and statements from those individuals who were found in Kansas before actually serving the grand jury subpoenas (2Tr. at 165, 192). The subpoenas were obtained the same time as the search warrant (2Tr. at 190). The pick-up orders were issued the same day the warrant was executed (2Tr. at 48).

15. In issuing the pick-up orders, no one at this meeting intended to present any of these individuals to a state prosecutor (1Tr. at 72, 100; 2Tr. at 30, 51, 75, 155, 326, 328). The sole purpose of issuing the pick-up orders was to interrogate the women and obtain photographs and fingerprints (2Tr. at 30, 74–75, 154, 290, 291, 326, 328).

16. On June 21, 1995, Sergeant Hargarden, Supervisor of the Kansas City, Missouri Police Department Vice Unit, conducted a strategy session during which it was decided that Detective John Rooney of the Kansas City, Missouri Police Department would enter in the police computer (the ALERT system) pick-up orders the following morning— June 22, 1995 (1Tr. at 14, 33, 38, 55, 57). A tactical team was organized to execute the search warrant on Clarke's residence, and it was decided that detectives from the various police departments would be paired up with agents from the federal agencies to conduct interviews of those individuals who were arrested pursuant to the pick-up orders (1Tr. at 39; 2Tr. at 292, 322).

17. At approximately 7:00 a.m. on June 22, 1995, Detective Rooney arrived at the police station to enter pick-ups in the ALERT system on some 14 individuals, including defendant Marilyn Roberts, in connection with the prostitution investigation (1Tr. at 37, 39, 52, 55, 64). The pick-ups were issued for "20 hour holds" (2Tr. at 51). At the time he entered the pick-up orders, Detective Rooney knew that it was likely

federal charges would be brought as a result of this investigation and that the evidence that would be gathered as a result of these pick-ups would be utilized in a federal investigation (2Tr. at 22).[4] He had not reviewed the affidavit in support of the search warrant which had been prepared by Agent Gasvoda and presented to U.S. Magistrate Judge John Maughmer the preceding day (2Tr. at 49, 58). The pick-up orders were entered prior to the search and were not based on anything found in Clarke's residence during the search (2Tr. at 55).

18. The search of Clarke's residence at 907 East 42nd Street began at approximately 8:00 a.m. on June 22, 1995 (2Tr. at 12). The entry team consisted of six officers and one sergeant (1Tr. at 56). Detective Rooney arrived at the residence after the entry team had gone into the house (1Tr. at 56). There he encountered codefendant Jennifer Hatcher (2Tr. at 45). He detained her and asked her if she would be willing to talk (2Tr. at 45). She said she would not talk without an attorney present, so Detective Rooney stopped his questioning and took her picture then let her go (2Tr. at 46).

19. If a person arrested pursuant to a pick-up order invokes his or her right to counsel, no questioning is conducted (2Tr. at 55). Further, if arrestees voluntarily give photographs and fingerprints, they are normally released as there is no further reason to hold them (2Tr. at 55).

20. A total of 9 or 10 of the original 14 individuals entered into the ALERT system were actually picked up on June 22, 1995 (1Tr. at 64, 65). Those 9 or 10 were taken to various detention units throughout the city in outlying patrol divisions (1Tr. at 64). The reason the individuals were separated was the police and agents did not want to give the individuals an opportunity to "get their stories together" (1Tr. at 66). Subsequent to being interrogated, the arrestees were transferred to the main detention unit (1Tr. at 66). None of these individuals were processed through the state system (1Tr. at 69, 99).

---

**4.** Detective Panuco and Agent Gasvoda were aware of this as well (2Tr. at 155, 290).

21. After the women were interrogated, a detective released them without conferring with the federal prosecutor or with the county prosecutor (2Tr. at 79).[5]

22. Prior to defendant's arrest, Detective Rooney checked with the Kansas Department of Revenue in an attempt to obtain a driver's license photograph of defendant (2Tr. at 17).[6]

23. On two occasions after the issuance of the pick-up, Detective Panuco and a Secret Service Agent went to defendant's residence in Kansas City, Kansas, but were told the first time defendant was out of town and the second time that defendant did not want to talk to them (2Tr. at 143–144). Approximately 45 minutes after leaving defendant's residence on the second occasion, they arrived at TWA where they had been told defendant was employed (2Tr. at 144). Someone at TWA verified defendant's employment but said she was not working that day (2Tr. at 144). On June 29, 1995, Detectives Panuco and Oakman went to codefendant Maude Clarke's residence, saw defendant's car parked in front, and set up surveillance (2Tr. at 144–145). Late that night, they saw two females exit the house, get into Clarke's car, and drive away (2Tr. at 145). The detectives followed the car to the Wal–Mart Hypermart located at 9051 Hillcrest Road and saw the women enter the store (2Tr. at 145–146).

24. At approximately 11:19 p.m. on June 29, 1995, Officers Rita Olson–Stawicki and Laura Huggens were in the vicinity of the Wal–Mart Hypermart and were flagged down in the parking lot by Detectives Panuco and Oakman (2Tr. at 83, 84, 95, 147). The detectives advised that a woman had entered the store who was the subject of a pick-up order (2Tr. at 83–84, 95). The detectives handed Officer Olson–Stawicki a photograph (P.Ex. 2) of a passport photograph which had been seized during the search of Clarke's residence (2Tr. at 84–85, 95, 148, 161).

25. Detectives Panuco and Oakman did not enter the store to arrest defendant themselves because they were dressed in plain clothes (2Tr. at 86, 147). For safety reasons and to make sure there is no mistake as to the identity of the parties making the arrest, uniformed officers are preferred (2Tr. at 147).

26. Officers Olson–Stawicki and Huggens entered the store and looked for defendant (2Tr. at 86). Officer Olson–Stawicki was able to identify defendant from the photograph, approached her and asked her name (2Tr. at 86–87, 96, 161). After defendant identified herself, Officer Olson–Stawicki advised defendant that she would have to go to police headquarters pursuant to a pick-up order (2Tr. at 87). Defendant was very cordial at the time (2Tr. at 87). She requested that the officers contact Maude Clarke with whom she was shopping (2Tr. at 77). The officers handcuffed defendant, then went to the front of the store and had Clarke paged (2Tr. at 87). At the time Clarke was being told of defendant's arrest, defendant was still behaving in a cordial manner (2Tr. at 88).

27. Officer Olson–Stawicki took defendant outside the store and placed her in the front seat of the patrol car (2Tr. at 88). At that time, defendant was still behaving OK (2Tr. at 89). Officers Olson–Stawicki and Huggens transported defendant to police headquarters (2Tr. at 89). Detectives Panuco and Oakman followed in their separate vehicle (2Tr. at 150). During the trip, defendant got progressively upset (2Tr. at 90, 105). By the time the officers turned defendant over to the detention facility officer, which was a little after midnight, defendant appeared to be agitated as she was mumbling things such as "This is a bunch of crap, this is a bunch of shit" (2Tr. at 92, 110). Officer

---

**5.** Detective Panuco, however, testified first that the decision of whether to release these women rested with the federal agent in charge (2Tr. at 161, 175–176).

**6.** Detective Rooney first testified that he "tried every means possible to obtain a photograph of [defendant] through the Department of Revenue in Kansas and any other place that might have had one"; but when asked to name the places he looked, the only places he named were the Kansas DOR and his own department's mug shot archives. He did not check with any federal sources (2Tr. at 17, 80).

Olson–Stawicki went to a nearby room to complete forms (2Tr. at 93).

28. If a detective had been present, defendant's photograph could have been taken prior to booking while she was still in her street clothes, a procedure which has been used in the past (2Tr. at 121).

29. Although it normally takes anywhere from five to twenty minutes to book an arrestee, Detectives Panuco and Oakman waited on the second floor of the police station for one and one half hours before going up to the eighth floor detention unit to talk to defendant (2Tr. at 150–151, 174).

30. Detention facility officer ("DFO") Linda Hutson began the booking process on defendant by asking her questions about medications, diseases, etc. (2Tr. at 114). Defendant refused to answer each question, stating that she refused to answer until she could talk to her attorney (2Tr. at 114).

31. Because defendant refused to answer any questions, she was placed in a paper suit, which is a shirt and pair of pants made out of paper (2Tr. at 115). Defendant was first taken to a room and was asked to remove her clothes (2Tr. at 116). Defendant was still handcuffed at the time (2Tr. at 116). Defendant cussed at Officer Hutson, so Officer Tina Morales entered the room and held defendant while Officer Hutson stripped her and put the paper clothing on her (2Tr. at 116).

32. From the other room, Officer Olson–Stawicki heard a loud "ruckus" from the booking area (2Tr. at 93). She looked out and observed three to four detention facility officers placing leg shackles on defendant (2Tr. at 93, 104–105).[7] Defendant was wearing paper clothes at this time and was still handcuffed (2Tr. at 97).

33. Officer Hutson placed a spit mask on defendant because defendant tried to spit at Officer Hutson and because it was unknown whether defendant had tuberculosis since she had refused to answer the question (2Tr. at 117). The policy of the Kansas City, Missouri Police Department is to put spit masks on arrestees who are uncooperative and "possibly spitting at the officers" (2Tr. at 19). Defendant was placed in detention and held until her release late the next morning (2Tr. at 118). Although defendant requested to make a phone call, she was not allowed to do that (2Tr. at 129).

34. When Detectives Panuco and Oakman arrived in the detention unit, Panuco told Officer Hutson that he was there to talk to defendant (2Tr. at 151, 199). Hutson told Panuco that he might not want to talk to her because they had to restrain her (2Tr. at 151). Detectives Panuco and Oakman were taken to defendant's cell and introduced themselves (2Tr. at 152). At the time, defendant was wearing a paper suit and a spit mask, was handcuffed to the bars of the cell and was "messed-up looking" (2Tr. at 152). When Detective Panuco asked defendant if she wanted to talk to him, she said she had nothing to say and that she would talk to him in front of her lawyer (2Tr. at 152, 182). Detective Panuco first testified that he interpreted that statement as an invocation of her right to an attorney (2Tr. at 153). A minute later, however, he testified that he did not pass on to Detective Rooney that defendant had requested a lawyer because "She to me didn't invoke her right to an attorney.... She said she would talk in front—with her lawyer. She says I'll talk to you in front of my lawyer." (2Tr. at 153–154).[8]

---

[7.] Officer Hutson testified that leg shackles were put on defendant because she would not stay in one place and wanted to kick everyone who walked by (2Tr. at 118, 126). However, Officer Hutson later stated that defendant had only tried to kick Officer Hutson (2Tr. at 126). She also testified that she was the only person involved in placing the leg shackles on defendant and did this by having defendant kneel down while the shackles were put around her ankles (2Tr. at 118). I do not find this testimony credible in light of the testimony of Officer Olson–Stawicki who said she observed that defendant was involuntarily held up against the wall face forward while three to four officers put shackles on her (2Tr. at 105). Officer Olson–Stawicki's testimony is more credible in that it is hard to believe defendant would willingly kneel down to have leg shackles put on if she had been as belligerent and uncooperative as was reported up to that point.

[8.] On cross-examination, Panuco stated that he must have misunderstood the question (2Tr. at 155). He further stated that "[S]he said I'll talk to you in front of my lawyer, but I— ... I didn't take that as her invoking her right to an attorney." (2Tr. at 155–158).

35. Detective Panuco asked defendant to submit to fingerprinting and photographing but she refused (2Tr. at 176, 178–179). Although he was in possession of a federal grand jury subpoena ordering defendant to do just that on July 25, 1996, he left it at the front desk and did not serve it (2Tr. at 176–177). Detective Panuco told defendant that she could be served a federal subpoena requiring her to be photographed and fingerprinted (2Tr. at 176). His purpose in saying that to defendant was to entice her to voluntarily submit to those things in his custody (2Tr. at 176). Defendant replied, "You don't look like a subpoena" (2Tr. at 179).

36. That evening, Detective Rooney was notified that defendant had been arrested pursuant to the pick-up order (2Tr. at 16). Several hours later, he received a page from Detective Panuco notifying him that there had been no statement or photograph taken of defendant and that he might want to try again in the morning (2Tr. at 16, 25, 26, 52). Detective Panuco was hopeful that if defendant stayed in custody for another seven or eight hours, she would decide to cooperate (2Tr. at 174–175). He also believed that defendant could not be released until the federal authorities were notified and concurred in the decision to let her go (2Tr. at 175–176).

37. Detective Rooney waited until the next day to go down to the police station to question defendant and obtain her photograph (2Tr. at 16, 17–18, 28–30). It is not his normal practice to go to the police station right away when he is notified that someone is arrested because "normally they're good for 20 hours and you've got time left to go down the next day or that afternoon when you come in" (2Tr. at 54).

38. The next morning, on June 30, 1995, Detective Rooney went to the Detention Unit of the police station to obtain photographs of defendant and to see if she wanted to talk (2Tr. at 18). Officer Hutson told Detective Rooney that defendant had stated that she wanted to talk to an attorney regarding the medical questions (2Tr. at 130). Detective Rooney knew at the time that the evidence

he would attempt to obtain would be utilized in a federal investigation (2Tr. at 22). When the detention officer delivered defendant to Detective Rooney, defendant was wearing a blue paper suit and a surgical mask, referred to as a spit mask, around her neck (2Tr. at 19, 36).

39. Detective Rooney asked defendant if she wanted to talk (2Tr. at 19).[9] Defendant said she had nothing to say (2Tr. at 19). Detective Rooney told defendant that he needed to take her photograph, and defendant replied that Rooney was not going to take a photograph (2Tr. at 19). Detective Rooney told defendant he could either do it the easy way or do it the hard way and asked her to remove the mask (2Tr. at 19, 48). Defendant replied that if Detective Rooney wanted to take her picture, he would have to "take it the way it was" (2Tr. at 19). She also stated that he was taking her picture against her will to which Detective Rooney replied it was "duly noted" (2Tr. at 48). Although Detective Rooney did not testify that he advised defendant what the hard way was, during the hearing he stated that the "hard way" is where officers hold a suspect still in order to take his or her picture (2Tr. at 19–20).

40. Without having officers hold defendant still, Detective Rooney took three pictures of her (2Tr. at 20). Although he could have, Detective Rooney did not remove the mask from around defendant's neck because he thought it might agitate the defendant (2Tr. at 35, 48). One of the pictures was given to Special Agent Steve Gasvoda for use in a photo lineup (P.Ex. 1A; 2Tr. at 20–21). One picture was placed in Detective Rooney's working file and the other was placed in the case file (2Tr. at 21). All three of the pictures looked the same, all showing defendant wearing a blue paper suit and having a spit mask around her neck (2Tr. at 21).

41. The picture that was placed in the photo spread showed defendant with mascara smeared under her eyes, which is not how she appeared when she was arrested (2Tr. at 106). In addition, she appeared to be more

9. There is absolutely no mention of defendant being advised of her *Miranda* rights. However, since there is no motion to suppress any kind of statement before me, I will not explore that issue.

fatigued than at the time of her arrest and was "worn-out looking" (2Tr. at 106–107).

42. At detective school, Detective Rooney learned that it is important to try to have photographs of people with similar features when preparing a photo spread (2Tr. at 23–24). He also was aware that photographs showing some people in hospital gowns or paper suits while others are wearing casual clothes can "taint the photo spread" (2Tr. at 24).

43. When presenting a photo spread to a witness, Detective Rooney tells the witness to remember that appearances do change, especially in females because they have a tendency to cut their hair short or wear it a different way and that make-up has a lot to do with it (2Tr. at 42).

44. The photograph of defendant which was used by Officer Olson–Stawicki to locate defendant in the Hypermart store was not used for a lineup because the detectives did not want to take evidence out of the property room, rather they wanted to safekeep it and "preserve its value" (2Tr. at 163).

45. Detective Oakman was responsible for finding filler photographs for the approximately ten photo spreads used on all of the alleged prostitutes (2Tr. at 200, 223). He searched for photographs in several units of the Kansas City, Missouri Police Department (2Tr. at 200). He first gathered all of the available photographs of white females of which there were few (2Tr. at 201). Working with the photos available, Detective Oakman searched through approximately ten photos and from them picked the filler photos for defendant's photo spread (2Tr. at 202). None of the photographs of white females that Detective Oakman looked at showed the person wearing a spit mask or a paper suit (2Tr. at 202). Because defendant was wearing those two things, it was a "challenge" for Detective Oakman to find photographs which could be used as fillers in this photo spread (2Tr. at 214).

46. Agent Gasvoda collected photographs of white females from the files of the Secret Service and combined them with the ones provided by Detective Oakman (2Tr. at 277–278). He had a total of approximately 100 to 125, and from those he was required to use 75 to complete the number of photo spreads he was preparing (2Tr. at 278). When compiling the photo spread of defendant, he could not find five photos showing women who had similar characteristics (2Tr. at 280–281). In addition, he had no pictures of women who were wearing spit masks (2Tr. at 281). He described the process of putting together this line up with what he had available as difficult (2Tr. at 296).

47. After the photo spreads were prepared by the Secret Service, Detective Oakman met with a Mark Lograsso at the Secret Service Office to show him the photo lineup containing defendant's picture (2Tr. at 204, 225). In July 1995, Mr. Lograsso had been told that he was going to be questioned about an escort service called MCC Remodeling, to identify credit card receipts, and to look at photo lineups (2Tr. at 204). Specifically Detective Oakman told Lograsso that he had photo spreads of the "girls" and he would like Lograsso to identify the woman if he could (2Tr. at 205).

48. At the beginning of the interview with Lograsso on July 6, 1995, he relayed to Agent Gasvoda and Detective Oakman the way he had contacted the agency, how the initial contact was set up, the financial transaction, the services performed by the women and the names of the women he paid for (2Tr. at 234–235, 249). On the seven occasions he used the service, Lograsso had sex with women whom he knew as Christie, Krystal, Cherry and Elizabeth (2Tr. at 235, 258).

49. Lograsso was shown four photo spreads during the interview (2Tr. at 237, 238). Although Lograsso was not told that one of the prostitutes was depicted in each spread, he assumed that was the case (2Tr. at 238, 250, 304). It took Lograsso two to three minutes to choose defendant's photo as the person he knew as Elizabeth with whom he had met once for approximately 30 minutes on May 17, 1995 (2Tr. at 239–240, 245, 246, 247, 258). The process of choosing defendant's photo included ruling out two pictures—number 2 and number 5—right away (2Tr. at 240). He ruled out number 5 because she was a brunette (2Tr. at 252).

Christie was the only brunette he had been with and did not look like the woman in number 5 at all (2Tr. at 262). Number 2 is obviously older than any of the other women in the spread (P.Ex. 1). Lograsso had not been with any prostitute who appeared to be as old as the woman depicted in photo number 2 (2Tr. at 261). Lograsso described Elizabeth as being around 33 or 34 (2Tr. at 260, 268). He then eliminated number 1 since she looked like his niece and he had not been with any prostitute who looked like his niece (2Tr. at 240, 249–250). He then eliminated number 3 because she looked familiar but not like any of the prostitutes he had been with (2Tr. at 240). That left him with numbers 4 and 6 to choose from (2Tr. at 240, 250). Lograsso thought the mask around defendant's neck looked strange and did not know why she was wearing it (2Tr. at 242). When he identified number 6 as one of the women he had been with, he was pretty certain although not 100% certain (2Tr. at 243).

50. After Lograsso identified the photo of defendant, he stated, "Why does she look like that? She doesn't look the same." (2Tr. at 207, 227, 286, 287).[10] Detective Oakman thought Lograsso was referring to the spit mask and paper suit (2Tr. at 227). Lograsso stated that this photo spread was the hardest one to identify one of the prostitutes from (2Tr. at 244, 253, 269). Lograsso was told by Agent Gasvoda that defendant had been uncooperative, and proceeded to recount for Lograsso the fact that the other women had not put up a struggle and had taken the time to fix their make-up before being photographed (2Tr. at 216–217, 227, 244, 287, 300). Lograsso told Agent Gasvoda that if all the women in the pictures had been blonde, he was not sure if he could have picked out defendant (2Tr. at 252, 304).

51. Mr. Lograsso, who needs corrective lenses, did not wear his glasses while he was engaging in sexual intercourse with the woman he knew as Elizabeth (2Tr. at 248). The lights were dimmed in the bedroom (2Tr. at 267). During the sexual encounter, on a scale of 1 to 10, one being that Lograsso paid no attention to the way Elizabeth appeared and 10 being that Lograsso paid a lot of attention, he rated his attention at a 4 or a 5 (2Tr. at 255). After the sexual encounter, Lograsso put on his glasses and talked with Elizabeth as she got cleaned up and dressed (2Tr. at 255). He was also able to observe her when she first arrived (2Tr. at 266). At that time, they discussed the transaction and she telephoned for credit card approval (2Tr. at 265–266). During those few minutes, Lograsso was wearing his glasses and was looking at Elizabeth's face (2Tr. at 265–266).

### III. IDENTIFICATION

Defendant argues that the photo spread was impermissibly suggestive and that the identification of her photograph by Mark Lograsso was not independently reliable.

### A. IMPERMISSIBLY SUGGESTIVE PHOTO SPREAD

■ Due process challenges to an out-of-court identification are reviewed by a two part test. Initially, the court must decide whether the identification procedure was "impermissibly suggestive." *United States v. Johnson,* 56 F.3d 947, 953 (8th Cir.1995). If it was, the court must then determine whether, under the totality of the circumstances, the suggestive procedure created a very substantial likelihood of irreparable misidentification. *Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 2253–54, 53 L.Ed.2d 140 (1977); *United States v. Johnson,* 56 F.3d at 953; *United States v. Murdock,* 928 F.2d 293, 297 (8th Cir.1991). The second part of the test reflects the fact that not all impermissibly suggestive confrontations give rise to a very substantial likelihood of irreparable misidentification. *United States v. Henderson,* 719 F.2d 934, 936 (8th Cir.1983).

■ I find that the photo array in this case was impermissibly suggestive. The lineup consists of six photographs. All of the photos depict females, and there is where the

---

**10.** There was some discrepancy about whether Lograsso reported that the conversation about defendant's putting up a struggle before being photographed occurred before or after his identi-fying her picture (2Tr. at 252, 300–304; P.Ex. 4). I conclude that that conversation occurred after Lograsso identified photograph number 6.

similarity of the photos ends. The woman in photo number 1 appears to be either a teenager or in her very early 20s. The woman in photo number 2, however, appears to be at least in her 50s. The women in numbers 1 and 4 have blonde hair, the woman in number 2 has gray hair, the woman in number 3 has red hair, and the woman in number 5 has brown hair. None of the women in pictures 1 through 5 are wearing a paper suit or a spit mask like defendant was wearing when her photograph was taken. Even Detective Oakman testified that having a mask around one's neck is an important factor in compiling a photo array (2Tr. at 214). Agent Gasvoda testified that the subjects in the photo array should have similar characteristics, "race, hair, and everything, if possible, should be as close as possible." (2Tr. at 295). During the hearing, the following testimony was presented through Agent Gasvoda:

Q. All right. So you don't want to have five people that are markedly different in age from the suspect, correct?

A. With what you had to work with, yes.

Q. Okay. Well, whether you have it to work with or not, to put together a photo lineup that's appropriate, you don't want your filler pictures to be markedly different in age than your suspect. That's true, isn't it?

A. Unduly, yes.

Q. And the same thing is true, you wouldn't want the suspect to be one race, and all the fillers to be another race, correct?

A. Correct.

Q. You wouldn't want your suspect to be one hair color, and all your fillers to be another hair color, correct?

A. When possible.

Q. Well, whether it's possible or not ... to meet your test of suggestiveness or non-suggestiveness, you don't want the suspect to have brunette hair and all the fillers to have blonde, right?

A. Yes.

Q. Okay. Now, you testified that you had a lot of trouble putting together the photo lineup that's been marked as Exhibit # 1, is that correct?

A. Correct.

Q. And the reason was you could not find, or had difficulty finding photographs that would not make the photograph of the suspect unduly suggestive, isn't that correct? And you've defined that term for me.

A. Yes.

Q. And, as it turned out, you were not completely satisfied with the photo array that you were able to put together, right? It wasn't as good as you would have liked it to have been.

A. As an optimum, no. I mean, of course, a photo spread could be better, it could be continuously better. Is it the best that I could do? Yes.

(2Tr. at 295–296). Agent Gasvoda later testified that "[T]he fact that I don't have any other blondes that look like that, I don't think it's unduly suggestive [to use a redhead]." (2Tr. at 298). Detective Oakman testified that none of the photographs of white females he looked at showed the person wearing a spit mask or a paper suit (2Tr. at 202).

Whether the photo array is impermissibly suggestive does not depend upon the inventory of pictures the police department happens to have available as filler photos. The individuals in a photo array should be the same race, should possess similar physical features and should be alike in size, age and dress. *Salam v. Lockhart,* 874 F.2d 525, 529 (8th Cir.1989). In this case, it appears that all of the individuals are the same race. However, they do not have similar physical features and are not alike in age or dress. Indeed, Mr. Lograsso testified that he immediately ruled out numbers 2 and 5 due to age and hair color.

Because the photos in the array used for identification of defendant contained women who did not have similar physical features, hair color and age as defendant, and because defendant was wearing a blue paper suit, a spit mask around her neck and appeared extremely fatigued and "messed-up" with makeup smeared under her eyes, I find that

the photo array was impermissibly suggestive.

## B. INDEPENDENT RELIABILITY OF IDENTIFICATION

■ If it is determined that a photo array was impermissibly suggestive, the court must then determine whether, under the totality of the circumstances, the suggestive procedure created a very substantial likelihood of irreparable misidentification. *Manson v. Brathwaite,* 432 U.S. at 116, 97 S.Ct. at 2253–54. In determining whether an impermissibly suggestive confrontation creates a very substantial likelihood of irreparable misidentification, the court must weigh five key factors:

1. The witness's opportunity to view the criminal;

2. The witness's degree of attention;

3. The accuracy of the witness's prior description of the defendant;

4. The witness's level of certainty when identifying the suspect at the confrontation; and

5. The length of time which has elapsed between the crime and the confrontation.

*Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (1972); *United States v. Rundell,* 858 F.2d 425, 426–27 (8th Cir.1988); *Hulsey v. Sargent,* 821 F.2d 469, 473 n. 5 (8th Cir.), *cert. denied,* 484 U.S. 930, 108 S.Ct. 299, 98 L.Ed.2d 258 (1987).

■ In determining whether the identification procedure was impermissibly suggestive, defendant bears the burden of proof by a preponderance of the evidence. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

## 1. OPPORTUNITY TO VIEW SUSPECT

■ Mr. Lograsso, who needs corrective lenses, did not wear his glasses while he was engaging in sexual intercourse with the woman he knew as Elizabeth. The lights were dimmed in the bedroom where they were the majority of the time. After the sexual encounter, Lograsso put on his glasses and talked with Elizabeth as she got cleaned up and dressed. He was also able to observe her when she first arrived. At that time, they discussed the transaction and she telephoned for credit card approval. During those few minutes, Lograsso was wearing his glasses and was looking at Elizabeth's face. Under these circumstances, there were a few minutes when Lograsso had the opportunity to view Elizabeth. However, it is unclear whether he was actually focusing his attention on her face during that brief time.

## 2. DEGREE OF ATTENTION

Lograsso testified that during the sexual encounter, on a scale of 1 to 10, one being that Lograsso paid no attention to the way Elizabeth appeared and 10 being that Lograsso paid a lot of attention, he rated his attention at a 4 or a 5. Afterward when she was getting cleaned up and they were talking, she was using the bathtub while he stood at the sink cleaning himself. He no doubt was required to spend at least some of that time watching what he was doing rather than staring at the prostitute's face.

## 3. ACCURACY OF PRIOR DESCRIPTION

There is absolutely no evidence in this record that Lograsso ever gave a physical description of the prostitute he knew as Elizabeth prior to his viewing the photo arrays.

## 4. WITNESS' LEVEL OF CERTAINTY

Lograsso testified that he was "pretty certain although not 100% certain" that the woman in number 6 was a prostitute he had paid for services. He also testified that he assumed the photo array contained the photograph of one of the women he had been with, and that he identified number 6 through a process of elimination. It took him several minutes to choose defendant as one of the prostitutes he had been with, and indicated that this was the most difficult lineup to choose someone from. He told Agent Gasvoda that if all of the women in the array had had blonde hair, he was not sure if he could have picked out defendant.

## 5. LENGTH OF TIME

The date of the act of prostitution involving Mr. Lograsso occurred on May 17, 1995, and lasted thirty minutes. He was called to

the offices of the U.S. Secret Service on July 6, 1995, to make the identification. Lograsso had used the escort service on at least seven occasions during a six-month period and had sex with women whom he knew as Christie, Krystal, Cherry and Elizabeth.

Considering the totality of the circumstances, I find that the identification of defendant by Mark Lograsso was not independently reliable. There were only a few minutes of the entire 30–minute encounter during which Lograsso had his glasses on and the two individuals were in a lighted room together. Lograsso was obviously a frequent customer of the escort service and had paid for the services of at least four different prostitutes. Seven months after the initial identification, Lograsso referred to defendant as Sheri rather than Elizabeth, stated that his memory was getting worse with time, but immediately picked out photo number 6 when shown the photo array for a second time (2Tr. at 304–305). Lograsso repeatedly confused defendant with prostitutes named Sheri and others, and was unable to put a name with a face (2Tr. at 305). Lograsso admittedly was not paying much attention to the way the prostitute looked during the encounter which occurred almost two months before his identification, he had never given police an identification of her prior to the photo i.d., was not 100% certain that he had chosen a prostitute, but assumed so since he had eliminated everyone else and was under the assumption that each lineup contained the photograph of one prostitute he had been with. All of these factors indicate that the identification was not independently reliable but was the product of the impermissible suggestive photo array.

Therefore, because the photo array was impermissibly suggestive and because under the totality of the circumstances, the suggestive procedure created a very substantial likelihood of irreparable misidentification, defendant's motion to suppress on this basis should be granted.

## IV. UNCONSTITUTIONAL ARREST

Defendant next argues that her arrest pursuant to a Missouri pick-up order was unconstitutional as it was a pretextual arrest and was not supported by probable cause. I find that the arrest—pursuant to the Missouri 20–hour hold law and admittedly solely for investigative purposes in an investigation run by a federal prosecutor—was without probable cause; the arrest was pretextual, that is, defendant was arrested for the sole purpose of interrogating her and collecting evidence resulting in an unconstitutional arrest; and defendant's detention violated Federal Rule of Criminal Procedure 5(a) since she was never presented before a judge.

### A. PROBABLE CAUSE

Defendant argues that her arrest was not supported by probable cause because (1) until her arrest on June 29, 1995, defendant had not been identified as the woman leaving Maude Clarke's residence on February 22, 1995; and even if she had been, there was absolutely nothing criminal about her visit to Clarke on that occasion; and (2) the woman who allegedly engaged in an act of prostitution on March 20, 1995, at the Holiday Inn was not identified as defendant until the day of her arrest.

In its response, the government argues that, after reviewing the 41–page affidavit, Judge Maughmer issued a warrant to search Maude Clarke's residence. Then:

> Some twenty-two hours later, acting on precisely the same information contained in Agent Gasvoda's affidavit, Detective Rooney entered pick-up orders for all subjects whom the investigation had determined were involved with MCC Remodeling, into the Kansas City, Missouri Police Department's ALERT system computer, to be distributed metrowide.

Probable cause exists if the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent person's belief that the suspect had committed or was committing an offense. *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991); *United States v. Magness,* 69 F.3d 872, 874 (8th Cir.1995). Probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and

need not be based solely upon the information within the knowledge of the officer on the scene. *United States v. Horne,* 4 F.3d 579, 585 (8th Cir.1993), *cert. denied,* 510 U.S. 1138, 114 S.Ct. 1121, 127 L.Ed.2d 430 (1994).

During the evidentiary hearing on codefendant Maude Clarke's motion to suppress, the government concluded its presentation of evidence without putting ·on any evidence of probable cause. After a suggestion that probable cause evidence might be helpful since it was an issue, the government did indeed present that evidence (1Tr. at 100–102). At this hearing, held subsequent to the Clarke hearing, the government again failed to put on evidence of probable cause apparently (from the briefs) relying on the affidavit in support of the warrant to search Maude Clarke's home, which is not in evidence and was not attached to any pleading in this case. During this hearing, defendant referred to what was marked as Defendant's Exhibit 1 (Request for Indictment) which is the formal report submitted by the United States Secret Service to the United States Attorney's Office containing 70 pages of information about this investigation. That exhibit was not offered or admitted by anyone; however, in order to make an accurate determination of whether probable cause did exist, I will take judicial notice of that exhibit as well as the affidavit in support of the search warrant.

After reviewing all of that material, I conclude that the police did not have probable cause to arrest defendant Marilyn Roberts on June 29, 1995. Following are the portions of D.Ex. 1 and the affidavit in support of the search warrant where defendant Marilyn Roberts is mentioned:

*Defendant's Exhibit 1:*

On February 1995, a black Honda CRX was observed arriving at 907 E. 42nd, Kansas City, Missouri. The white female occupant, later identified as Marilyn Roberts exited her vehicle and entered the residence. Roberts stayed at the residence for approximately one and one half hours. Upon departing the residence, Roberts was followed to the Broadway Cafe (4118 Broadway, Kansas City, Missouri), Wal-

Mart (7701 Frontage Rd., Overland Park, Kansas) and then to her residence in Kansas City, Kansas.[11]

On 03/20/95, while monitoring the pen registers, incoming and outgoing telephone calls were observed at 8:16, 8:17, 8:28, 8:33 and 8:55 p.m. from the Holiday Inn Hotel, 7333 NE Parvin Rd., Kansas City, Missouri. A perimeter surveillance was established on the hotel. At 9:28 p.m., a black Honda CRX arrived at the hotel and park[ed] in the parking lot. A white female, who was identified as Marilyn Roberts, exited the vehicle and was followed to room 352 in the hotel. At 10:37 p.m., Roberts was observed leaving the hotel and she was followed to a residence in the 4900 block of Dixie Court, Kansas City, Kansas.

Continuing on this date, at 11:15 p.m., Detective John Rooney and the writer contacted the occupant of room 352, who identified himself as Peter A. Peterson with an Iowa drivers license. Mr. Peterson advised that at approximately 8:15 p.m., this date, he looked through the yellow pages of the telephone book and called "Centerfold" escort service and asked if any escorts were available. Mr. Peterson stated he gave the person who answered the phone some personal information and was told someone would call him back. Approximately 10 minutes later, Mr. Peterson said he received a telephone call from a female who identified herself as "Elizabeth." Mr. Peterson stated Elizabeth told him she would be at his hotel in one hour or less.

Mr. Peterson advised that at approximately 9:30, a white female arrived at his door who identified herself as Elizabeth. Mr. Peterson stated that he agreed on $235.00 for the service and he gave Elizabeth his Mastercard credit card and $100.00 cash. Mr. Peterson advised that Elizabeth called the escort service and received authorization for his credit card. Mr. Peterson said Elizabeth told the escort service that $135.00 was going on the credit card and asked if the billing should reflect "MCC

---

**11.** This is a direct quote from D.Ex. 1, page 18, first full paragraph.

Company" on the receipt. After that telephone conversation, Mr. Peterson stated Elizabeth took out a small credit card imprinter and imprinted his credit card on a receipt to reflect $135.00 and hand wrote "MCC Company." At that point, Mr. Peterson said he also gave Elizabeth the $100.00 cash. Mr. Peterson stated he and Elizabeth had straight sexual intercourse. After intercourse, Mr. Peterson said received [sic] another telephone call from the escort agency asking for the escort. Elizabeth then left after the telephone conversation.

Mr. Peterson did advise that during casual conversation, Elizabeth made the statement that she was sorry it took so long for her to arrive and went on to explain she had to drive over from Kansas.[12]

*Affidavit in Support of Search Warrant:*

32. On February 22, 1995, an individual identified as Marilyn Roberts was observed arriving at 907 East 42nd, Kansas City, Missouri. Roberts stayed at the residence for approximately one and one half hours. Upon departing the residence, Roberts was followed to several retail businesses and then to her residence in Kansas City, Kansas. Subsequent investigation has revealed Marilyn Roberts to be engaged in prostitution.

47. On March 20, 1995, at 8:13 p.m., the pen registers recorded a telephone call from a number listed to the Holiday Inn Hotel, 7333 N.E. Parvin Rd., Kansas City, Missouri to (913) 451-7770 (Centerfold Escorts) which was forwarded to (816) 931-8927, answered at 907 East 42nd Street, Kansas City, Missouri. At 8:17 p.m., the pen registers recorded a telephone call from (816) 931-8951, located at 907 East 42nd Street, Kansas City, Missouri, to a number listed to the Holiday Inn Hotel, 7333 N.E. Parvin Rd., Kansas City, Missouri. At 8:26 p.m, the pen registers recorded a telephone call from a number listed to the Holiday Inn Hotel, 733 [sic] N.E. Parvin Rd., Kansas City, Missouri to (816) 931-0209 (Prestigeous (sic) Escorts). At 8:35 p.m., the pen registers recorded a telephone call to a cellular telephone number (816) 881-8182 from (816) 931-8927, located at 907 East 42nd, Kansas City, Missouri. Based on this information, surveillance was established at 7333 N.E. Parvin Road, Kansas City, Missouri. At 9:28 p.m. an individual identified as Marilyn Roberts was observed as she arrived at the Holiday Inn Hotel and was followed by a surveillance team member to room 352 where she knocked on the door. At 9:43 p.m., the pen registers recorded a telephone call from a number listed to the Holiday Inn Hotel to (816) 924-2604 (Affair D'Amour Escorts) which was forwarded to (816) 931-8927. At 10:24 p.m., the pen registers recorded a telephone call from (816) 931-8927, located at 907 East 42nd Street, Kansas City, Missouri, to a number listed for the Holiday Inn Hotel. At 10:37 p.m., the surveillance team observed Roberts leave the hotel and followed her to a residence in the 4900 block of Dixie Court, Kansas City, Kansas. It should be noted the pen registers recorded a telephone call at 10:04 p.m. from the above listed residence to (816) 454-8585 (Dreamgirl Escorts) which was forwarded to (816) 931-8927, located at 907 East 42nd Street, Kansas City, Missouri.

48. The occupant of room 352 was contacted and identified himself as Peter P. (for identification purposes) from Council Bluffs, Iowa. Peter P. stated he was in town on business and decided to call an escort. Peter P. advised that at 8:15 p.m., he looked through the yellow pages of the telephone book and called "Centerfold Escorts" at (913) 451-7770 and asked whether any escorts were available. Peter P. stated that a female who answered the telephone took his name and telephone number and told him they would call him back. Peter P. stated that shortly thereafter he received a telephone call from a woman he believed to be the same woman who had previously answered the telephone. The woman asked him what he did for a living and where he was from. The women [sic] told Peter P. that he would receive another telephone call shortly. Peter P. stated approximately 10 minutes

---

12. D.Ex. 1 at pages 22 and 23.

later, he received a telephone call from a female who identified herself as "Elizabeth" who told him she would be at his hotel in one hour or less.

49. Peter P. advised that at 9:30 p.m., "Elizabeth" (later determined to be Marilyn Roberts) arrived at his door and told Peter P. that the service would be $235.00. Peter P. stated he paid $100.00 cash and gave her a credit card for the remaining balance. Peter P. further stated "Elizabeth" called the escort service, advised $135.00 was going on the credit card, asked whether the billing should reflect "MCC Company" on the receipt and obtained an authorization number for the credit card charge.

50. Peter P. stated after the financial transaction was completed, "Elizabeth" told him to get comfortable and she went into the bathroom. A few minutes later, Peter P. stated "Elizabeth" returned wearing a bra and panties. Peter P. and "Elizabeth" then had sexual intercourse. After the act was completed, Peter P. said the service called his room and asked for the escort. "Elizabeth" told the service she would be leaving shortly. Peter P. stated during casual conversation with "Elizabeth", she apologized for arriving late and gave the reason that she had to respond from Kansas.

Although these documents indicate that the woman involved on these two occasions was later identified as Marilyn Roberts, there is no indication of when that identification was made, by whom, and the basis for that identification. Mr. Peterson was never asked to give a description of the prostitute he was with, and the only description that appears in either of these documents was that the prostitute was a white female.[13] There is nothing in these documents tying the phone numbers called prior to the sexual encounter to defendant Marilyn Roberts. The car which the woman entered after the encounter was followed to a residence in the 4900 block of Dixie Court, Kansas City, Kansas; however, defendant's residence is at 6611 North Berry, Kansas City, Kansas—the address she was followed to on February 22,

1995, after visiting codefendant Maude Clarke (and the address which appears on the grand jury subpoena which was issued but not served). There is nothing in this information tying the Honda CRX to defendant. However, Detective Panuco testified that he had run the license plate and had learned that the car "came back" to defendant (2Tr. at 145).

Detective Rooney testified at the hearing that he was one of several officers who followed defendant to the coffee shop and then to her residence on February 22, 1995. He testified that he was able to see her going in and coming out of the shop at night sometime between 9:00 and 11:00 p.m. (2Tr. at 39). When asked if he was able to identify the individual who walked into the coffee shop as anyone who was involved in this investigation, he said no, but that a couple of individuals, including Marilyn Roberts and "another individual listed at that address" matched the age of the woman who went into the coffee shop (2Tr. at 40). Detective Rooney was also on surveillance at the Holiday Inn on March 20, 1995. It was night time when Elizabeth arrived at the hotel and she walked with her back to him the whole time. Although he saw that her height, weight, and hair coloring were the same as the woman he saw go into the coffee shop on February 22, 1995, he could not tell whether they were the same person (2Tr. at 41).

On the night of her arrest, defendant was seen exiting Maude Clarke's residence with Clarke and getting into Clarke's car. The detectives watching her could not identify her as Marilyn Roberts. They followed her to the Hypermart store and, in the lit parking lot, were able to identify her as Marilyn Roberts. Detective Panuco stated that the information he had about defendant's description was that she was 5'6" tall, weighed 140 lbs. and was a white female. However, at that time, the detectives were in possession of P.Ex. 2, a passport photograph of Marilyn Roberts which had been seized from Clarke's residence after the pick-up orders were issued. Without that photograph, the only description of defendant that the police

13. See 2Tr. at 41–42.

had was her height, weight, race, sex, age and hair and eye color.

On the day the pick-up orders were entered, the police knew only that a woman with the same approximate height, age and hair color drove a Honda CRX to the hotel and engaged in an act of sexual intercourse for money. No description of the prostitute was obtained from the client. The description of the woman also matched the description of a woman who was suspected of engaging in prostitution and was located at the same address as defendant.

The government's argument that Judge Maughmer made a probable cause determination on the very same information as that known by Detective Rooney is flawed. First, the probable cause determination made by Judge Maughmer was whether there was probable cause to believe that evidence of a crime would be found in Maude Clarke's residence. Marilyn Roberts' arrest must be supported by probable cause that a crime was committed and that Marilyn Roberts committed that crime. Further, in an affidavit in support of a search warrant, it is not important to indicate how a suspect was later identified, by whom and what factors went into that identification, especially when the person at issue is not related to the place sought to be searched. Therefore, regardless of whether the police had identified the person who went into the coffee shop and the person who went to Holiday Inn, the fact that a call came into Maude Clarke's residence which began a chain of calls resulting in an act of prostitution presumably by someone who crossed state lines is the important aspect when considering whether there is probable cause to search Maude Clarke's home. Had the government requested a complaint and arrest warrants for the suspected prostitutes the same time it requested a warrant to search Clarke's residence, it would have been required to show that there is "probable cause to believe that an offense [had] been committed and that the defendant [had] committed it". F.R.Cr.P. 4(a). In that respect, the fact that a woman who allegedly engaged in an act of prostitution was "later identified as" someone would certainly not have been sufficient to obtain an arrest warrant. The government would have been required to provide *facts* showing that defendant was the person who committed the offense, not mere conclusions that Marilyn Roberts was indeed the person known as "Elizabeth."

Therefore, I find that defendant's arrest was not supported by probable cause even assuming that I am entitled to judicially notice the affidavit and the Request for Indictment.

### B. PRETEXTUAL ARREST

■ Evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the fourth amendment is inadmissible in a federal criminal trial. *Elkins v. United States,* 364 U.S. 206, 223, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960). The test is one of federal law, "neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Id.* at 224, 80 S.Ct. at 1447.

■ In this case, the government argues that defendant was lawfully arrested pursuant to the Missouri 20–hour hold law. This position was advanced unapologetically in both the pleadings and in the testimony of the government witnesses at both hearings mentioned above. The 20–hour hold law is found in Section 544.170 of the Missouri Revised Statutes which reads as follows:

All persons arrested and confined in any jail, calaboose or other place of confinement by any peace officer, without warrant or other process, for any alleged breach of the peace or other criminal offense, or on suspicion thereof, shall be discharged from said custody within twenty hours from the time of such arrest, unless they shall be charged with a criminal offense by the oath of some credible person, and be held by warrant to answer to such offense; and every such person shall, while so confined, be permitted at all reasonable hours during the day to consult with counsel or other persons in his behalf; and person or officer who shall violate the provisions of

this section, by refusing to release any person who shall be entitled to such release, or by refusing to permit him to see and consult with counsel or other persons, or who shall transfer any such prisoner to the custody or control of another, or to another place, or prefer against such person a false charge, with intent to avoid the provisions of this section, shall be deemed guilty of a misdemeanor.

■■■■ This statute is not a sword in the hands of the police, but rather a shield for the citizen. The statute does not create an investigative tool for Missouri police officers or an independent basis for arrest; rather, it sets a limit on the amount of time the police may detain a suspect, whose arrest is otherwise lawful, while *determining* whether there is enough evidence of a crime to present the suspect to a judge or prosecutor to begin criminal proceedings. Indeed, the Supreme Court in *United States v. Lefkowitz,* 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932), held that an arrest for the primary purpose of furthering an ulterior goal is unreasonable under the fourth amendment. In that case, the Court held that "[a]n arrest may not be used as a pretext to search for evidence." *Id.* at 467, 52 S.Ct. at 424. Therefore, any interpretation of Section 544.170 which includes authority for making investigative arrests would clearly be unconstitutional. Unfortunately, the Missouri police officers, and now the federal prosecutor's office, the United States Secret Service, the Internal Revenue Service, and the Bureau of Alcohol, Tobacco and Firearms have adopted this oxymoronic interpretation of the statute.[14]

The Supreme Court has never specifically decided the pretext issue. However, in *Horton v. California,* 496 U.S. 128, 138, 110 S.Ct. 2301, 2309, 110 L.Ed.2d 112 (1990), the Court stated that:

The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement.

This statement seems to indicate that the Court, if presented with the question, would adopt what has been termed the "absolute objective approach." That approach was adopted by the Eighth Circuit in *United States v. Cummins,* 920 F.2d 498, 501 n. 3 (8th Cir.1990), *cert. denied,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991), where the court stated:

The officer's motive becomes relevant only after a determination is made that the Fourth Amendment actually was violated. When this threshold issue is resolved in the affirmative, the officer's state of mind may be relevant in determining whether the exclusionary rule should be applied. *Scott v. United States,* 436 U.S. 128, 139 n. 13, 98 S.Ct. 1717, 1724, n. 13, 56 L.Ed.2d 168 [1978].

■■■ Therefore, as articulated in *United States v. Cummins,* 920 F.2d at 501, the official test in the Eighth Circuit is "so long as the police are doing no more than they are legally permitted and objectively authorized to do, the resulting stop or arrest is constitutional." The first inquiry, then, becomes whether the police were doing no more than they were legally permitted and objectively authorized to do. I believe the facts indicate that clearly they were not.

As stated above, in federal court whether a suspect's fourth amendment right has been violated is a question of federal law. *Elkins v. United States,* 364 U.S. at 223, 80 S.Ct. at 1447. It is undisputed that the federal agents here knew they were not permitted to arrest suspects pursuant to Missouri's 20–hour hold law.[15] Although federal agents

---

14. The government, in *its* supplemental response, states that "The concept in Missouri of a 'twenty hour hold' ... refers to the time within which a person detained must be charged or released, and does not relate at all to the cause for the detention. A 'twenty hour hold' contemplates nothing less than an arrest, which must pass constitutional muster." However, the government does not even attempt to explain how an arrest, with no warrant and for the sole purpose of furthering a criminal investigation, passes fourth amendment constitutional muster, either in federal court or in state court.

15. See 2Tr. at 165–166.

may make an arrest without a warrant provided they have probable cause to do so, Federal Rule of Criminal Procedure 5(a) requires that the arrestee be brought before a magistrate judge "without unnecessary delay". Therefore, under no circumstances would a federal agent be able to make a warrantless arrest, supported by probable cause, then hold the suspect for 20 hours while interrogating the suspect, taking her photograph, and obtaining her fingerprints all before releasing her "pending further investigation."

Thirty-six years ago, in *Abel v. United States*, 362 U.S. 217, 225, 80 S.Ct. 683, 690, 4 L.Ed.2d 668 (1960), the United States Supreme Court was asked whether the government used an INS administrative warrant for illegitimate purposes since the FBI was simultaneously interested in Abel for suspected espionage. There the defendant argued that it was not the government's true purpose in arresting him under the warrant to take him into custody pending a determination of his deportability. Rather the government's real aims, Abel argued, were to place him in custody so that pressure might be brought to bear upon him to confess his espionage and cooperate with the FBI and to permit the government to search through his belongings for evidence of his espionage to be used in a designed criminal prosecution against him. The Court stated:

> Were this claim justified by the record, it would indeed reveal a serious misconduct by law-enforcing officers. The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts. The preliminary stages of a criminal prosecution must be pursued in strict obedience to the safeguards and restrictions of the Constitution and laws of the United States.... [H]owever, ... on this record ... [t]he crucial facts were found against the petitioner.

*Id.* at 226, 80 S.Ct. at 690.

Thirteen years later, in *Gustafson v. Florida*, 414 U.S. 218, 94 S.Ct. 494, 38 L.Ed.2d 427 (1973), the defendant challenged the search of his person after a concededly valid custodial arrest for driving with a suspended license. Heroin was found during the ensuing search. Justice Powell, in a concurring opinion, noted that Gustafson would have presented a different question "if [he] could have proved that he was taken into custody only to afford a pretext for a search actually undertaken for collateral objectives." *Id.* at 238 n. 2, 94 S.Ct. at 494 n. 2.

The Ninth Circuit was presented squarely with the issue of the police engaging in a deliberate scheme to evade the requirements of the fourth amendment in *Taglavore v. United States*, 291 F.2d 262 (9th Cir.1961). In that case, Taglavore, who was a suspect in a marijuana investigation, was observed by a police officer failing to signal for a right turn and having faulty brake and signal lights. The officer did not stop Taglavore, but waited until the next day to obtain arrest warrants for those traffic violations. He then delivered the warrants to other inspectors and directed them to go out at once and find Taglavore, knowing that Taglavore at that time would likely have marijuana in his possession. The court, in reversing the conviction, held that:

> The police engaged in a deliberate scheme to evade the requirements of the Fourth Amendment by using a traffic arrest warrant to search appellant for narcotics they suspected he had on his person.... This is not a case where some minor technicality has been overlooked in acquiring an arrest or search warrant or where a police officer confronted with a sudden and unexpected situation has made a miscalculation in acting; such cases present a far different situation. Here instead we have a deliberate, pre-planned attempt by the police to violate a suspect's constitutional rights by engaging in a subterfuge. "It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Boyd v. United States*, 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886).

*Id.* at 267. Therefore, the court found that regardless of probable cause, the illegal activities of the police rendered the contested evidence inadmissible. *Id.*

Then in 1987, the Eighth Circuit Court of Appeals, in *Warren v. City of Lincoln, Nebraska,* 816 F.2d 1254, 1259 (8th Cir.1987), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989), held that if a jury found by the evidence that Warren's arrest on a traffic warrant was "nothing more than a subterfuge or pretext executed to get Warren into police headquarters to be questioned about an unrelated matter, [that would be] unlawful."

In *Warren,* the suspect was found by police sitting in his car in the vicinity of a recent burglary. He was suspected of participating in that burglary and a string of sex-related burglaries. Warren was questioned, and an officer was informed after conducting a warrant check that Warren had an arrest warrant outstanding for speeding and failing to appear on the citation. Warren was arrested, patted down, and taken to the police station. He was interviewed there by a detective who was investigating the robberies, was fingerprinted, handprinted, and photographed. Two hours later he was released after posting a $50 bond on the traffic charge.[16] The court held that "[o]n the basis of these facts, a jury could have concluded that Warren's arrest on the traffic warrant was *nothing more than a subterfuge or pretext executed to get Warren into police headquarters to be questioned about an unrelated matter and as such was unlawful.*" (emphasis added). The court further held that:

> Police are not permitted to hold someone in custody beyond the time necessary to process him with respect to the crime of arrest for the sole purpose of trying to connect that person to another crime. To do so is an unlawful seizure.

*Id.* at 1259. The court cited with approval excerpts from *Adams v. United States,* 399

F.2d 574 (D.C.Cir.1968), *cert. denied,* 393 U.S. 1067, 89 S.Ct. 722, 723, 21 L.Ed.2d 710 (1969), wherein the court held:

> Rule 5(a) provides that presentment without unnecessary delay shall be made on the charge for which they were arrested. . . . To continue their custody without presentment for the purpose of trying to connect them with other crimes *is to hold in custody for investigation only, and that is illegal;* its operative effect is essentially the same as a new arrest and, if not supported by probable cause, it is an illegal detention.

*Adams v. United States,* 399 F.2d at 577. Former Chief Justice, then Judge, Burger stated in his concurring opinion, also cited with approval by the Eighth Circuit in *Warren,* as follows:

> To my mind, the importance of the investigation of crimes other than that for which the original arrest was made is not that there may be something resembling a new "arrest," but that the period of "unnecessary delay" forbidden by Fed.R.Crim.P. 5(a) has then been reached. Necessary delay can reasonably relate to time to administratively process an accused with booking, fingerprinting and other steps and sometimes even to make some limited preliminary investigation into his connection with the crime for which he was arrested, especially when it is directed to possible exculpation of the one arrested. However, when delay of presentment to the magistrate is for the purpose of investigation of other crimes, then there is no doubt that the "delay" has become "unnecessary."

*Warren,* 816 F.2d at 1260, quoting *Adams v. United States,* 399 F.2d at 579.

16. Warren sued the police department under § 1983. The issue addressed by the Eighth Circuit was whether the trial court's due process of law instruction was correct. That instruction stated that Warren was arrested for speeding and failing to appear in court in connection with the charge of speeding and that the officers could properly detain Warren beyond the time necessary to process him with respect to that offense if they had reasonable grounds to believe that such action was necessary in order to carry out legitimate investigative functions. The Eighth Circuit held that the instruction should have provided the jury the opportunity to make the determination whether Warren was arrested on the traffic offense or whether the arrest was pretextual since "[o]n the basis of these facts, a jury could have concluded that Warren's arrest on the traffic warrant was nothing more than a subterfuge or pretext executed to get Warren into police headquarters to be questioned about an unrelated matter and as such was unlawful."

In *United States v. Johnson*, 994 F.2d 740 (10th Cir.1993), state and federal agents, following a federal lead, visited the defendant's taxidermy shop, allegedly in order to interview him and inspect the shop. The defendant was out of the country. The agents showed an employee a statute that authorized a state inspection, and three state agents and one federal agent began to search the premises. The agents discovered specimens of federally protected migratory birds resulting in the subsequent indictment. Upon challenge that the search was pretextual, the court held:

> [T]he administrative search was employed solely as an instrument of criminal law enforcement. The uncontroverted facts establish that the federal agent used the state inspection as a pretext for a broad investigatory search. We have not been cited to any federal statute that authorizes a warrantless inspection of taxidermists. A Wyoming statute authorizes inspections of taxidermists, *but only when performed by state agents.*

*Id.* at 743 (emphasis added). The court found that the federal agent's active participation in the search transformed the state inspection into a federal investigatory search. *Id.* The court further held that:

> On this record, such a course appears objectively unreasonable.... Because the evidence uniformly establishes that the federal agent initiated this operation for federal law enforcement purposes, ... we conclude that the warrantless search was unreasonable. The presence and active participation of the federal agent during the search of Mr. Johnson's shop, and the federal agent's insistence that the state agent accompany him establish as a matter of law that the federal agent used the state regulatory inspection as a pretext for an investigatory search. *Federal agents may not cloak themselves with the authority granted by state inspection statutes in order to seek evidence of criminal activity and avoid the Fourth Amendment's warrant requirement.*

*Id.* at 743–44 (emphasis added).

On facts similar to those discussed above, courts around the country have consistently warned that this kind of abuse will not be tolerated in courts. *See United States v. Trigg*, 878 F.2d 1037, 1043 (7th Cir.1989) ("Law enforcement authorities who stockpile arrest warrants for traffic offenses or nonpayment of library fines in order to have a 'ready-reserve' when arrest (or harassment) of a particular citizen is desired deserve no protection in the name of judicial restraint."), *cert. denied*, 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991); *Taglavore v. United States*, 291 F.2d at 266 ("Were the use of misdemeanor arrest warrants as a pretext for searching people suspected of felonies to be permitted, a mockery could be made of the Fourth Amendment and its guarantees. The courts must be vigilant to detect and prevent such a misuse of legal processes.").

Obviously, none of these cases is identical to the situation here.[17] However, the universal principal in each case is that evidence obtained by intentionally circumventing procedures which are in place to protect constitutional rights shall be suppressed, and the concerns expressed in each case lend support to the conclusion that the arrest and detention in this case was unconstitutional.

In *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), the Supreme Court expressed its opinion that using an administrative warrant to interrogate a suspect for a criminal investigation would reveal "serious misconduct" by the police and must "meet stern resistance by the courts." Justice Powell reiterated this concern in his concurring opinion in *Gustafson v. Florida*, 414 U.S. 218, 94 S.Ct. 494, 38 L.Ed.2d 456 (1973). Here the government used a Missouri statute which criminalizes police conduct as a federal investigative tool, circumventing the requirements of obtaining an arrest warrant and presenting the suspects to a judge for commencement of criminal charges. As stated in *Abel*, this is "ser-

---

17. There are few cases outlining exactly what constitutes an unconstitutional pretextual arrest, no doubt because that type of arrest is rare.

ious misconduct" which must "meet stern resistance by the courts."

The Ninth Circuit reversed a conviction after the police engaged in a deliberate scheme to evade the requirements of the fourth amendment by purposely obtaining and executing a warrant for a traffic violation at a time when the suspect was likely to be possessing marijuana. *Taglavore v. United States*, 291 F.2d 262 (9th Cir.1961). Here, the police obtained a federal search warrant from Chief U.S. Magistrate Judge John Maughmer the day before the search was to be conducted and the suspects arrested. The government argued that the information in the search warrant affidavit established probable cause to arrest defendant; however, the government intentionally refrained from requesting a judicial determination of that probable cause, opting instead to execute the preplanned scheme of arresting defendant pursuant to a Missouri pick-up order. In that way, the government engaged in a deliberate scheme to evade the requirements of an arrest warrant, issued by a neutral judge, and Rule 5(a) requiring prompt presentation before a judge.

As in *Warren v. City of Lincoln, Nebraska*, 816 F.2d 1254 (8th Cir.1987), *cert. denied*, 490 U.S. 1091, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989), the defendant's arrest in this case was nothing more than a subterfuge or pretext executed to get her into police headquarters to be interrogated, photographed, and fingerprinted.

■ Similarly, as stated in *Adams v. United States*, 399 F.2d 574 (D.C.Cir.1968), *cert. denied*, 393 U.S. 1067, 89 S.Ct. 722, 21 L.Ed.2d 710 (1969), any time of detention for an investigative purpose past that required for processing the defendant on the crime for which she was arrested is unlawful.

Finally, I find that the facts in *United States v. Johnson*, 994 F.2d 740 (10th Cir. 1993), are extremely similar to those in this case, and that the legal reasoning parallels that followed in the Eighth Circuit. In that case, the federal government used a statute available only to state officers to effectuate a federal criminal investigation. In this case, the federal government also used a statute available only to state officers to advance a federal criminal investigation. Worse, in *Johnson* the court stated that the government, which had the burden of proof, offered no evidence as to why the federal agent wanted the state agent to participate in this investigation. In this case, the federal agents openly admitted that the state officers were necessary to utilize the Missouri 20–hour hold statute as federal agents clearly could not effectuate such an arrest. Under the above-cited case law, clearly the agents in this case may not rely on the state officers effecting an arrest pursuant to a Missouri pick-up order where their sole purpose is to conduct a federal criminal investigation.

Based on all of the above authority, I can reach no other conclusion than that the intentional circumvention of the requirements of Rule 5(a) and the requirement that a neutral judge issue an arrest warrant, for the purpose of interrogating, photographing and fingerprinting a suspect amounts to a violation of the fourth amendment.

■ Because a determination has been made that the fourth amendment was actually violated, the officers' state of mind becomes relevant in determining whether the exclusionary rule should be applied. In this case everyone involved—from the prosecutor to the case agent to the assisting detectives all the way down to the arresting officers— knew that defendant would not be charged on that occasion and that the sole purpose of the arrest was for investigation, illegal under *United States v. Lefkowitz*, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932). Further, defendant was placed in a paper suit merely because she refused to answer questions, albeit medical, without an attorney. Her repeated demands for a lawyer fell on deaf ears; and even the detectives aware of those demands failed to pass that information on, rather advising the next detective on duty to try again in the morning.[18] The night of

---

18. Detective Panuco testified that he did not consider defendant's statement "I'll talk to you in front of my lawyer" to be an invocation of defen-

dant's right to counsel. I cannot imagine what more could be needed to invoke that right and

defendant's arrest, the police knew that she had invoked her right to an attorney and that she was not going to voluntarily allow them to photograph her. Yet, they kept her in custody over night for the sole purpose of coercing her into being photographed or providing a statement.[19] Indeed, the next morning, after defendant had repeatedly invoked her right to counsel, she was asked again (without the benefit of *Miranda* warnings) by Detective Rooney if she wanted to talk. Meanwhile, the police were in the possession of a federal grand jury subpoena directing defendant to appear before the grand jury on July 25, 1995, to submit to photographing and fingerprinting. Rather than serve that subpoena, lying on the front desk of the police station, they kept her in jail in a paper suit handcuffed to the cell bars and wearing a spit mask for hours on end for the sole purpose of obtaining what the subpoena required. All of this commands that the evidence obtained as a result of defendant's arrest and all the fruits thereof be suppressed. This obviously includes the photographs obtained the day after defendant's arrest while she was still in custody. It also includes any identifications made using the photo array.

Because I find that the arrest of defendant pursuant to the Missouri 20–hour hold law was an unlawful pretext for investigative purposes, and that the government intentionally circumvented procedures in place to protect defendant's constitutional rights, the evidence outlined above should be suppressed.

## C. RULE 5(A)

■ Federal Rule of Criminal Procedure 5(a) states that "any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate judge". Where the requirements of Rule 5(a) are not met, any resulting confession must be suppressed. *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). In this case, there is no question that the defendant was not presented, at any time, before any judge. Rather, defendant was arrested pursuant to a Missouri pick-up order, held for nearly twelve hours in a paper suit, photographed the next day while she was "messed-up looking," wearing the paper suit and a spit mask around her neck, and subsequently released.

■ In applying Rule 5(a), ordinarily the relevant delay is measured from the commencement of federal detention. *United States v. Woods,* 613 F.2d 629, 633 (6th Cir.), *cert. denied,* 446 U.S. 920, 100 S.Ct. 1856, 64 L.Ed.2d 275 (1980). However, when there is a working arrangement between state police and federal agents for the purpose of aiding and abetting the federal officers in carrying on interrogation of the suspect in violation of Federal Rule 5(a) requiring prompt presentment before a judge, the delay is measured from the time of detention. *United States v. Woods,* 613 F.2d at 633.

■ In this case, it is not really important when the delay measurement should begin since there is obviously no ending point—defendant was *never* presented before a judge. However, I find that there is proof of a "working relationship" which would begin the clock at the time of detention. The federal government (the agents and the prosecutor) agreed to instruct a state officer to issue a pick-up order for defendant for the sole purpose of furthering a federal criminal investigation.[20]

find that defendant did invoke her right to counsel.

19. This issue is more completely dealt with in Section V. below.

20. There should be no doubt that the arrest, detention, attempted interrogation, fingerprinting and photographing of this defendant were done pursuant to a working relationship with the federal government. This investigation was headed solely by the federal prosecutor's office. There is no question that no other prosecutor's office was involved at any time. The federal prosecutor had numerous meetings with the federal agents and state law enforcement officers during the pendency of the investigation. In fact, this case had federal strings woven throughout the entire investigative fabric: (1) The United States Secret Service monitored federally-authorized pen registers and trap and trace devices. The information derived from those pen registers and trap and trace devices included the fact that phone calls to several companies were all call forwarded to codefendant Maude Clarke's telephone number, the volume of calls coming into or going out of that telephone number, the iden-

This issue is similar to that presented in knock and announce cases. Under § 3109, a search conducted with the involvement of just one federal officer must comply with federal law. *United States v. Schenk*, 983 F.2d 876, 879 n. 5 (8th Cir.1993); *United States v. Moore*, 956 F.2d 843, 847 (8th Cir. 1992).

I find that Rule 5(a) applies to this case because of the working arrangement between the state police and federal agents, and that the requirements of Rule 5(a) were not met. Therefore, defendant's motion to suppress on this basis should be granted.

## V. EVIDENCE OBTAINED BY COERCION

■ Finally, defendant argues that her consent to be photographed came only after Detective Panuco utilized the grand jury subpoena in an effort to obtain her cooperation and after a lengthy coercive incarceration. The government argues that defendant's appearance is not protected by the fourth or fifth amendment.

■ There is no doubt that the fourth amendment does not create a privacy interest in defendant's likeness. Further the fifth amendment is not violated by photographing a suspect because there is nothing testimonial about one's likeness. However, evidence obtained during an unlawful detention is inadmissible. *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). Taking a person into custody and to the police station for questioning on less than probable cause to arrest violates the fourth amendment; and evidence obtained during that unlawful detention is inadmissible unless the government proves that there was a sufficient break in the causal connection between the illegality and the subsequently obtained evidence. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

In this case on this record, there was no probable cause to arrest defendant. She was taken to the police station and held for the sole purpose of coercing her to give a statement, fingerprints and/or a photograph. Incarcerating someone for the sole purpose of coercing her into giving a photograph for use in a photo lineup is a violation of her right to be free from unreasonable seizure of her person. I find that defendant's "consent" to being photographed was coerced and that the coercion resulted in a photograph which, placed in a lineup with other photographs, was obviously unduly suggestive.

Defendant was arrested without a warrant and without probable cause. She was taken to the police station in the middle of the night. Her repeated requests for an attorney were denied. Her requests to make a phone call were denied. She was stripped and placed in a paper suit merely because she refused to answer medical questions without an attorney. She was handcuffed to the bars of her cell, her legs were shackled, and her mouth was covered with a spit mask. All of this was done without a judicial determination of probable cause, all for the purpose of furthering a federal criminal investigation, all with the intent to merely hold the

---

tity of the women allegedly working for Clarke since their phone numbers were obtained, and the fact that an act of prostitution had probably been "ordered" which allowed the police to follow women to the hotels and later conduct "knock and talks" with the clients. (2) Federal grand jury subpoenas were used to obtain copies of checks written on the account of MCC Remodeling, which resulted in the agents learning that checks were written to women suspected of working as prostitutes, and apparently formed the basis for the federal forfeiture count in the indictment. (3) A federal search warrant authorized the search of Clarke's residence. (4) A temporary and a 90–day temporary restraining order were issued by two separate federal district court judges to seize real estate and personal property including bank accounts. (5) At the time of Clarke's arrest, her car was towed to a special tow lot in anticipation of forfeiture pursuant to the federal forfeiture statute. (6) A special agent with the United States Secret Service conducted the interrogation of Clarke, who was not presented with a *Miranda* waiver form in accordance with the policy of the U.S. Secret Service and in contradiction to the policy of the Kansas City, Missouri Police Department. (7) Federal grand jury subpoenas were obtained for suspects residing in Kansas, including defendant Marilyn Roberts, in the event they could not be arrested in Missouri pursuant to the pick-up orders. (8) Not one of the suspects in this case was ever charged in State court, and as mentioned above, the only prosecutor's office involved in the investigation and charging of these defendants was the United States Attorney's Office.

defendant in jail until she finally submitted to the wishes of the police officers or her 20 hours ran, whichever occurred first.[21]

On the night of defendant's arrest, the detectives waited until defendant had been in custody for one and one-half hours before attempting to talk to her. When they finally did go to see her, defendant was asked if she wanted to talk to the detectives but was not advised of her *Miranda* rights. She in no uncertain terms and on several occasions told the detention facility officer and two detectives that she would not speak to them without an attorney and that she would not voluntarily allow the police to photograph her. Rather than release defendant, Detective Panuco sent a page to Detective Rooney telling him to try again in the morning, but neglected to pass on the fact that defendant had requested an attorney, that defendant had refused to be photographed, that defendant was dressed in a paper suit, spit mask, hand cuffs and leg shackles, and that she, even at that early time in her detention, looked "messed up." Detective Panuco even testified that he was hopeful that if defendant stayed in custody for another seven or eight hours, she would decide to cooperate (2Tr. at 174–175). However, it should have been clear shortly after defendant's arrest that the police were not going to be able to obtain a photograph of her that would be usable in a photo lineup due to the restraint measures needed and the fact that she was already "messed-up looking."

Also during the original encounter with Detective Panuco, defendant was told that if she did not voluntarily allow the police to photograph her, she could be served with a subpoena requiring her to do so. However, defendant was not told that the subpoena was lying on the front desk in the station at that very moment and that it required her to appear before the grand jury nearly a month in the future (July 25, 1995), rather implying that defendant would be held in jail until the subpoena was obtained and would then be required to pose at that very moment. Detective Panuco testified that his purpose in

saying that to defendant was to entice her to voluntarily submit to being photographed and fingerprinted while in custody (2Tr. at 176).

The next morning, after an entire night of incarceration and still dressed in a paper suit and wearing the spit mask, defendant was approached by Detective Rooney who asked her, again without advising her of her *Miranda* rights, whether she wanted to talk to him. He told her that she would be photographed, either the easy way or the hard way. I cannot imagine how much harder an effort to photograph defendant would have been, and it is certainly plausible that the same thought went through defendant's mind. After being held in custody some ten hours while dressed in a paper suit, wearing a spit mask, her legs shackled and her wrist handcuffed to the cell bars; her requests for an attorney repeatedly ignored; her requests to make a phone call ignored; her make-up smeared; her hair a mess; her face tired and distressed looking; after being told that if she did not allow the detective to photograph her, she would be subject to a subpoena forcing her to, and that if she did not let the detectives photograph her the easy way, they would do it the "hard way," defendant consented to be photographed. It is hard to imagine a more coerced consent.

Because defendant was held in custody without probable cause and under the outrageous circumstances described above, I find that defendant's consent was the product of coercion. Therefore, defendant's motion to suppress on this basis should be granted.

### VI. CONCLUSION

Based on the above-stated findings of fact and the law as discussed in sections III through V, I make the following conclusions of law:

1. Because the photos in the array used for identification of defendant contained women who did not have similar physical features, hair color and age as defendant, and because defendant was wearing a blue

---

**21.** Further evidence of this can be found in the fact that codefendant Jennifer Hatcher was released immediately after submitting to being photographed at the time the search warrant was executed on Clarke's home.

paper suit, a spit mask around her neck and appeared extremely fatigued and "messed-up" with makeup smeared under her eyes, the photo array was impermissibly suggestive.

2. Because there were only a few minutes of the entire 30–minute encounter during which Lograsso had his glasses on and he and "Elizabeth" were in a lighted room together; Lograsso was a frequent customer of the escort service and had paid for the services of at least four different prostitutes; seven months after the initial identification, Lograsso referred to defendant as Sheri rather than Elizabeth, stated that his memory was getting worse with time, but immediately picked out photo number 6 when shown the photo array for a second time; Lograsso repeatedly confused defendant with prostitutes named Sheri and others, and was unable to put a name with a face; Lograsso admittedly was not paying much attention to the way "Elizabeth" looked during the encounter which occurred almost two months before his identification, he had never given police an identification of her prior to the photo i.d., was not 100% certain that he had chosen a prostitute, but assumed so since he had eliminated everyone else and was under the assumption that each lineup contained the photograph of one prostitute he had been with, the identification was not independently reliable.

3. Defendant's arrest was not supported by probable cause.

4. The arrest of defendant pursuant to the Missouri 20–hour hold law was an unlawful pretext for investigative purposes, and the government intentionally circumvented procedures in place to protect defendant's constitutional rights.

5. Rule 5(a) applies to this case because of the working arrangement between the state police and federal agents, and the requirements of Rule 5(a) were not met since defendant was never taken before a judge after her arrest.

6. Because defendant was held in custody without probable cause and under the outrageous circumstances described in Section V above, her consent to be photographed was the product of coercion.

Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order granting defendant's motion to suppress photo identification testimony and all of the fruits obtained as a result of defendant's unlawful arrest.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of receipt of a copy of this report and recommendation to file and serve specific objections unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

May 10, 1996.